a minor. Ready to proceed? Yes, Your Honor. Okay. Mr. Reed? Thank you, Your Honor. May it please the Court, Counsel. My name is Lauren Reed, and I represent the appellants, Anthony and Sarah Buddy, who are present in the courtroom today. The sole issue before this Court is whether or not the trial court's ruling was against the manifest way of the evidence. We do not have an issue here on fitness. That was handled, the biological father was found unfed. There was a motion to reconsider. There were several amended motions to reconsider. It was heard by another judge, and they confirmed the finding of unfitness. What we are here on today is solely that of best interest. It is important to go back to the beginning of this case. This case began long before 2017, when it was actually filed. This case began back in 2015, when the mother and father separated, leaving a 2-year-old little boy in the mix. That 2-year-old little boy went for over 2 years with the biological father failing to do anything to provide for him. He did not see him. He did not do anything that a parent would do in order to step up and actually be a parent. Nothing has changed as we stand here today, except we are now 4 years down the line. Instead of a 2-year-old that we had when the parties separated, or a 4-year-old that we had when the case first came to be, we now have a 6-year-old. So for 4 years, that 6-year-old has not seen the biological father, has not provided for this child. The child doesn't even know who the biological father is. It was only when the only father this child has ever known stepped up and wanted to make it official, and for them to be an official family, that the biological father decided he might want to do something. Now counsel is going to argue to you that the reason why the biological father did not see the child is because the mother prohibited him from doing so. That is absolutely false. There were a handful of times in the 2-year time period of 2015 to 2017 that the biological father asked the mother if he could see the minor. Every single time, the mother responded yes in a public place. Not one time did the biological father respond to any of those. So she did not deny him any visitation. She always said yes in a public place. It was on him that he failed to follow through with that. The other thing counsel is going to argue is that the biological father did provide health insurance for the minor for a very short period of time. He never provided any child support. He never provided any physical items for the child in the form of clothing, love for the child, affection, support, clothes, food, nothing of that nature. He did provide health insurance. What he is probably not going to tell you, but as you have seen in the record, is that the biological father did not even tell the mother that he had the child if the mother who cares for him doesn't know that this even exists. In fact, all that did was create a hardship for the child. That hardship came in the form of the child being very ill. He was ill, mother took him to the doctor, went to the pharmacy to get his medication, and it was only then that she was told her insurance card was not valid because he was the child. She had no idea what they were talking about. Through research from the pharmacy, they were able to find out that it was under the name of Curtis Burke, who is the biological father. The mother reached out to Curtis Burke asking, what is this about insurance? I need to get medication for the child. He never responded. She texted him. He never responded. I myself reached out to the biological father. He never responded. I reached out to the paternal grandmother. I was cussed out and I was hung up on. None of those things are showing a biological father who cares to provide for his son or even one person of his extended family who cares to provide for that child. A friend of the biological mother's reached out to the biological father. This was his response. Part has to be edited for the purposes we are here for today. And I'm only reading this to show that this best interest of this child does not lay with this father. His response when said that the child was sick and needed this insurance card was this. And I quote, I don't know who this is and I don't give a blank who you are. Don't ever stick yourself in my personal life. FYI, do not respond to this message and stay out of my blanking life. Take care of yourself and mind your own blanking business. Not one time did the biological father reach out to anyone, myself included, and he had all of my contact information including my personal cell phone number. Not one time did he reach out and follow up as to how that child was doing. Not one time. At best interest, the court is not to consider what is best for my clients, what is best for the biological father. It's what's best for the child. That's where the focus shifts when we are at best interest. We had a long, lengthy unfitness hearing lasting two plus days. As I've already stated, that came back in favor. At best interest, again, we have a six-year-old little boy. When you go through the best interest factors, every single one of them will point that it is best for the life of his father, Curtis Berg, to be terminated and for the father that he knows, the only father that he has ever known, to be able to adopt him. I will go through those for you. The physical safety and welfare of the child including food, shelter, health and clothing. The minor lives with his mother and with the father that he has known for over three-fourths of his life from the time he was two until the age of six. That's who he has known as his father. He lives there with his siblings. The development of the child's identity. The child identifies himself as Buddy. When this case first initiated, the child was just a newly turned four and was in preschool, just at the age where children are learning their letters, learning their name, how to spell their name, how to write their name. The child learned his name as Zane Buddy. He is now finishing up his kindergarten year of school. He identifies himself as Zane Buddy. That's what he goes by. That is his identity. And he identifies, again, with the family, the only family that he has ever known being his mother, who shares that last name, the father that he knows, Anthony Buddy, who are his siblings. Four of those siblings share that last name. One does not. He identifies with all of them as his brothers and sisters. And they have been raised together for the past four years. The next factor, the child's background and ties. Except for the first two years of the child's life, all of the child's background and ties are with the Buddy family. He is part of that family. He has a large extended family on the Buddy side. Who have welcomed him as their own. He has grandparents that he identifies with, aunts, uncles, cousins. He identifies with all of them. They are all at his celebrations, at his milestones. They support him like a family would. The biological father hasn't been there for any of that. Again, this child does not even know who the biological father is. And not only did he not follow up with the mother when she said he could see the minor in a public place, he never filed anything in court to seek parentage time with the minor. In fact, he was in court prior to the unfitness hearing even starting. Months before that even started. And he said he was going to go down to the basement and file for something that day. He never did. How more convenient could it have been for him? He was already there in the courthouse. All he had to do was go downstairs and file paperwork. He never did. It was only one year after the judgment of adoption was originally granted, 11 months after his motion to vacate, and 3 months after he was found unfit that he decided maybe I should file something for visitation. So 4 years later, he's going to file something for visitation after he's already been found unfit? That's not something that an active parent would do. I will continue now with the best interest factors. The child's sense of attachments, including security, sense of familiarity. Again, all he knows is the family of Anthony Buddy and his mother Sarah Buddy. He knows them as mom and dad. He has known them as mom and dad from the time he was 2 until today he is 6 years old. He knows the house. He knows his brothers and sisters. He knows his grandparents. That is his identity. The ages of 2 to 6 are crucial to a child. That's when your identity is forming. You're learning who you are and what it means to have a name. You're identifying your mother, your father, your brother, your sister, your grandparents. That's what he knows with the  child's community ties. The child has been in the same school district since he started preschool. He did 2 years of preschool. He's now in kindergarten. He has 3 years established in that same school district. Who has been there for every first day of school? Mr. Buddy. Who has been there for every birthday from the time the child was 3 until 6? That's 4 for the first day of school. For a doctor's appointment. For a birthday party. His biological father. The biological father couldn't even tell you where he went to school. He did know what grade he was in by estimation of his age. But he couldn't tell you where he went. He couldn't tell you who his teacher was. He could not tell you his activities. What he liked. What kind of food he liked. What kind of TV show he liked. What his favorite color was. He didn't give any of those. The person that could is Anthony Buddy. Moving on. The child's need for permanence, including the child's need for stability and continuity. Again, for 4 years that's all this child has known is his mother and Anthony Buddy. That is his father. That's who he goes to when he's happy. That's who he goes to when he's sad. That's who he goes to when he's sick. When he needs comfort of any kind, he goes to his mom and he goes to his dad. Not his dad by blood on paper, but Anthony Buddy. That's who he goes to. That's the man who stepped up and has provided for this child in every single way. He has provided financially for this child. The biological father has provided nothing. Not one penny since at least 2015. He hasn't provided any kind of emotional support, physical support. Nothing. He does not know the child. The child does not know him. So what we are left with is a finding of unfitness. If this court were to agree with the trial court and leave us at losing best interest, which the standard for that as this court knows, is preponderance of the evidence or more likely than not. This court is not one to speculate as to what the biological father may do in the future. It's to look at the facts. What has this father done? What has this child done? How is this child living and is that in the child's best interest? We cannot speculate that the biological father is now after four years maybe going to do something to parent. What he did in essence is he put the child on the shelf. He let the mother take care of him. He let Mr. Buddy take care of him financially and every other way. And only after they wanted to make that official did he decide, I don't really like that idea. He hasn't done anything to show us that he's going to change. Nothing. So we can't speculate that it's going to change now. What we do know are the facts that are presented and that is that every single best father of Anthony Buddy being his father. I leave you with this. Thank you. Thank you. Good afternoon. My name is Dave Ferencamp and I represent the father. After hearing the argument, I think we were at two different hearings. And I know we were at two different hearings because most of the argument that's given to you is based on a hearing that I wasn't party to and that was the fitness hearing. Are you facetious now or you really didn't? No. I wasn't at the first hearing which was a fitness hearing because I wasn't the attorney of record at that time. I filed a motive. You were at the first one. Correct. But I am the attorney who represented my client at the best interest hearing. And I'm not so sure I recognize the evidence that was suggested by counsel because what I heard was a completely different case. I heard a case in which a mother refused to allow contact with the father the moment he went back to his wife and basically said you don't care about the son while not letting him be near the son. It's like someone stealing your car and saying you're not a good father because you don't have transportation. Because here's what she did. This is the record of the hearing we're actually here on appeal on. The mother after separating my client went back to his wife. Two days later she sent him a text that said you know you really effed up. You really made it where you're never going to see me or Zane ever again. You blew us off for that nasty C word again. You're effing stupid. Now this is why lawyers in family cases love Facebook and love digital messaging because before we would never have it be an oral conversation. Now we've got it memorialized. And the court heard that. And that was just the beginning. Because what he would try to do is see his child and the nasty C she referred to was actually his wife. And she proceeded tonight every opportunity he tried to contact his son Zane. Every opportunity. On August 24th just four days after they separated she sent him a text that said with a picture of another man with his son and said Zach, whoever Zach is, took him for a ride. Funny how another man can play a better daddy role. And then she goes on time and time again. He asked to see his child. She goes here, here's your son. And she posts a picture on Facebook holding his son and saying there he is. I'm letting you see your son. She told him in October and this is around the time she's seen Mr. Buddy. I told you you are replaceable as a boyfriend and a father. Because as long as you are with that nasty piece of trash, his son, he calls my boyfriend daddy already. Can I ask you something with respect to there's a lot of obvious animosity against the wife. Right. Was there any evidence put forth that's in the record that shows that somehow the wife was a some type of bad influence on the child or horrible or potentially horrible influence? Was there any is there going to be anything in the record that supports that? The wife's offense was that she was the wife and that he went back to her and rejected the mother of the child. This went on even in November. She said as long as you are around, she sends a message to the wife. She says as long as you are around, he's never going to see or be a part of Zane's life. Zane has a man who took on the father role and calls him daddy. Now this is three months. So it goes on and on. I don't want nothing from him or near my children. That's on social media. So this is exhibits. This is actually evidence that's in there. She says, refers the father because he went back to his wife and states that although the mother states oh he walked out on Zane because he went back to his wife, he walked out on Zane. Now bear in mind, the day before and the days before they separated, he went back to his wife. He was watching the child along with the mother. She said she had no problem with his ability to do this. So nothing about his ability. The grovelment of his offense was that he didn't want her anymore and he wanted to go back to his wife and he did it. So she would post on Facebook, Zane's life is better without his deadbeat biological father. He continues to ask to see his son. That's the evidence. And again, not to confuse it, I didn't have anything to do with that first hearing. This is best interest hearing. Right, this is best interest hearing. And she responds to him, ha ha, you never kept him from you. You refused to meet in a public place. I have no sympathy for you. I'm not giving him to you. And that's an email to him. This is evidence. So what happens? I ask her. I said, so why did you feel important to keep him away? What did I say, from your public place? And she said, I was afraid he was going to keep him away from me. And I said, you mean you were afraid he was going to do what you did? And she said, well, I don't think he should be around the wife. But I said, are you saying that you wanted to keep him from doing what you've actually done and what she did? This case is remarkable for two reasons. One, in my opinion, she is extremely vile and selfish. And also she advertised it. So it is abundantly clear. Our judge, our trial judge, who had a chance to observe and testify, had a great opportunity to see her credibility and a great opportunity to see the vileness of, and this is just touching the surface. This is scratching the surface. A lot of it I haven't put in here because it's just totally offensive. And I'm concerned about the attempt to confuse my client being found unfit with the fact of the best interest. Because that's really two different things. And the fact he cares about this child. The fact he continued insurance. The fact she didn't tell him about Wendy's appointments, what he missed. That she wouldn't tell him. She wouldn't tell him that he went to school. She sent the grandmother, who she admitted was a loving grandmother. She admitted he was a loving father. In trial. But she kept them away. Because it didn't fit with her party. The thing that she wanted, to punish him and to set up her own little home. Well, that's not the way the law's supposed to work. And that's why the judge found it to be inappropriate to terminate the rights. And that's the recommendation of guardian ad litem. So when we go through this whole hearing, we look at this, she wants to tell you a different story about who she really is. Because quite frankly, I've been begging in this case, since the moment I got in, to have time with that child. And they've you to believe that he hasn't tried. And it's all now, it's been four years. Oh no. Even, we've got pending motions to see that child in court now. That the court's not addressing because this is pending. And until the court addresses, they refuse. They will not allow it. So I have a father who's been caring for, ever since I've gotten this case and before I got in this case, to see his child, only to have his nose rubbed in it. He and his other children would sing, make a birthday video. Every time they were denied access to a birthday party or a birthday, they made a video of the child and they kept it. So that one day, this child would know that dad cares, his brother cares, his sister cares. And these are children that the child had been around. Because he was two years old when mom did this. So he's preserving as much as he can and in spite of it, she still says no, he doesn't care. Well, he cares. But the problem in this case is that she took And you and her counsel tried to work something out? We have. Not worth it. No. It takes two to do that. And my client absolutely would love any opportunity to see his son under any conditions. The grandmother loved to see the child under any conditions. And there's no one, and matter of fact, the evidence says, no one's saying the child's unsafe with him. I was just going to ask that. No one's saying that he's a danger. He's got other children. Again, the offense that's And two days later, he gets what is very, very predictable. I mean, not predictable. It was unpredictable. But a very ominous threat, which is you're never going to see this child again. And he didn't. He didn't. And she wants to say because he turned down opportunities to meet in public. Those weren't real. I mean, the judge didn't even buy that trial. You said your client would see him under any circumstances. And I asked if counsel had worked together. Obviously, you can't see him even in public circumstances. It takes two to tangle, Your Honor. And if one of us is ready to tangle, we'd be happy to do that. We'd be happy to do it under any circumstance, anything. But no. And the reason it's been rejected is because this case is pending and waiting for you to either decide one way or the other and then go back to trial court. We've got a setting in trial court to say, because I've asked for it every single time, every time we've been in court. When the judge ruled from the bench on this, I asked for a schedule. I have another question. Refresh my recollection. There was a document that she sent to him that had been altered. Was that a birth certificate? She changed his name. She did a birth certificate change. What happened, one of our complaints was that she, in the adoption, said she did an unknown address affidavit. Didn't sign it. And said she didn't know where he was. He was in the exact same place he'd always been. Never changed. So she sends this affidavit. The idea is she wanted to slip this by without him knowing. And somehow he found out. So he was able to undo defaults because she said we just don't know where he is. Gosh. Well, he's in the exact same place he was. And she knew it. And she didn't sign it. So he was able to get some defaults vacated. And that's before I got involved. I got involved at the best interest phase. I wasn't involved before. But on his own, he filed things. Sometimes the path to justice is funny because we have better access sometimes if we have money or we don't have any money. Because you can possibly go to legal services. And if you have a lot of money, you can maybe hire a lawyer. But if you're in that middle range, it ain't fair. It ain't fun. But it's real. And you have to decide whether you're going to do something on your own. And not knowing something was I think it's appropriate not to terminate his rights. It's appropriate to keep this family relationship in existence. And it's better for the child. And the judge gave reasons on the record why she agreed. And she heard the case that we're here on. Not the case before, which was heard by Judge Flack, who couldn't hear it because he's no longer on the bench. But this is a case, it stands out because of the intense recording of her mindset. How did we get this? This is like a gold mine to show, did you say this? Did you do this? And it's all a pattern from the very beginning where her plan was to punish him because he went back to his wife. And the punishment was to keep Zane away and set up this child with a new name. So she would practice this child's saying the name that she wants him to have. But that adoption isn't going through yet. The trial judge said no, and I guess it's up to you to say whether you agree with the trial judge. Because right now I don't hear anything that shows that that decision was against the manifest way of the evidence. And the person who was there who heard this and saw this and actually didn't listen to what the lawyers said, but listened to what those witnesses said, didn't believe her. Didn't buy her story and felt that she did interfere. And that's one of the factors that's got to be considered in best interest. Even in this, in the best interest standard we have, is the willingness and ability of a parent to foster a close and continuing relationship with the other parent. Well she gets an F. And she wants to be rewarded for that by saying I want to go on my new life. And punish it. This guy, shame on him for having insurance on this child. Shame on him for not being able to get communication to her. Finally the people had to block her because her comments were so vile. The C word flows like rain. The F word flows. And she would post some of these on social media. So it was easy to document. Save it. Print it. Show it. This was on Facebook? A lot of it was on Facebook. I'm just wondering how you get it on Facebook unless you friend it. Well you post it publicly. So unless you block somebody. See I'm sort of learning the Facebook thing too, Your Honor. Although we're not allowed to use it. But the idea behind it is that she wants to be rewarded for doing something that, for a parent, it's like imposing her own death penalty on him as a parent. And that's unforgivable. And I think it's shown what she did in the trial. She may have passed by on that best interest thing. I didn't have anything to do with that. But when I did get it and we had a chance to see it and the judge saw it, I think the judge agreed that it's the best interest of this child to know that Zane has other people who love him and who've been there and who've recorded birthday videos just in hopes that mom would give in some way to let him see the siblings, grandparents, father. Who was the GAL? That's okay. No, no, you remember. Oh, Laurie Andrews. Thank you. I had to have help from my phone-a-friend. Yeah, so I mean. I beg your pardon? I'm sure she's still your friend. She is. Anyway, are there any questions? I want to make sure the issue of the court's finding that Curtis was unfit is not before us. Correct. That's not an issue. Thank you. Thank you, Your Honor. The majority of the argument that we've heard from opposing counsel goes to the factor of unfitness. As you just stated, Your Honor, we're not here to debate that. It's already been debated for days. It does go to one of the factors of best interest. Yes, it does. However, there are six or seven other factors that are also to be considered, which the trial court failed to do. The guardant ad litem, actually, as he touched upon, was in favor of this adoption, recommended that the adoption be granted, and it was granted. I believe you were referring to an altering of a document. I'm not sure what that was, other than there was a new birth certificate issued after the adoption was granted and the name changed. That's what I was confused about. There was a threat attached that if you keep contacting me, we will call the authorities or the police or something. That was in a. But there was not ever an alteration of any documents. There was a new birth certificate issued after the judgment of adoption was granted. As far as the service issue, the mother knew his address. We attempted personal service on him. I had a phone number for him. I called him. I left him messages. Was he represented? No, he had no representation. No, he was represented before Mr. Ferencamp by Debra Hawkins. She represented him in the adoption he filed, the motion to vacate, pro se, and then he obtained Debra Hawkins, who saw it through on fitness, and then he obtained Mr. Ferencamp after that. So I was a little bit disturbed by all this contact you were attempting to have with him personally. This was before the adoption was even filed. Because he had stated to Miss Buddy that he knew that she had an attorney. And then when we had the issue of the insurance, I reached out to him and asked him to contact me. He was not represented. Obviously, if he was represented, I would have gone to the attorney. But I just wanted to clarify that there was nothing to hide from him. We knew his address in the affidavit of publication. We again stated his address. He invaded service. There was nothing else that could be done. At the end of this... Did you publish then? Yes, I did publish. At the end of this, while it does go to one of the best interest factors, what the mom said or did does not change what the facts are. Even up on counsel said that this man would do anything to see his child under any circumstances. But he didn't for two years before the petition for adoption was filed. Mother offered every single time, which there were nine times. She offered every time. Yes, you can see him in a public place. He never followed through on that. So I don't know why this court is supposed to believe that now he's going to follow through with it. We're now four years down the road when he didn't do it prior when there were not attorneys or courts or anyone involved. Well, his response to that, I believe, was that he did not think it was genuine. And secondly, that if he did follow through, that there would be some kind of upset and hullabaloo and it would be a negative experience for everybody, the child included. And the court didn't find that argument to be valid. That was in the unfitness portion. And also if that truly was his thought, he could have filed something in court. This also goes hand in hand with a case that was heard here in the Fifth District. And I know it was a Rule 23 case. It was not cited as precedent by any means. However, it is a very good indication as to what this court thinks on the matters. You're not supposed to cite it at all unless it's part of the enumerated reasons in the rule. Correct. And the trial court is the one who actually handed this case to the parties. This was before Mr. Fagernkamp was involved when there was a separate attorney. Again, I'm not citing it for precedent. I don't understand it. The court gave this to you? The judge gave this case to you and that's why you're citing it to us? He did not give it to just me. He gave it to myself, the guardian... Just flat? Just flat. The guardian that lied to him and Mr. Brooks' attorney at that time, Deborah Hawkins. He handed it out to us before the infant is hearing started. That's why I felt it was relevant. And as you would see from both of the briefs, there's not a lot of case law cited and that's because the majority of cases on this issue are Rule 23 cases. Thank you very much.